Robert C. Symonds v. Commissioner. Gladys E. Symonds v. Commissioner.
Symonds v. Commissioner
Docket Nos. 21529, 26473, 21528, 26472.
United States Tax Court
1951 Tax Ct. Memo LEXIS 139; 10 T.C.M. (CCH) 712; T.C.M. (RIA) 51234; August 15, 1951
*139 Alva C. Baird, Esq., and William A. Cruikshank, Jr., Esq., for the petitioners. William P. Flynn, Jr., Esq., and Robert H. Kinderman, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in income tax for the years 1945, 1946, and 1947 of $4,014.17, $8,025.35, and $929.90, respectively, against petitioner Robert C. Symonds, and of $3,939.16, $7,954.10, and $806.40, respectively, against petitioner Gladys E. Symonds. The sole issue is whether capital gain treatment is to be accorded to profits on real estate sales by petitioners during the taxable years. Some of the facts have been stipulated. Findings of Fact The stipulated facts are hereby found accordingly. Petitioners, husband and wife, reporting income on a community property basis, filed separate returns on the cash method with the collector of internal revenue for the sixth district of California. Petitioner Robert C. Symonds, hereinafter called petitioner, has been engaged in the real estate business as a salesman and broker for about 33 years. His activities in that business include maintenance of an office, hiring of salesmen, obtaining *140 "listings" from real estate owners, advertising, finding purchasers, and negotiating transactions. He has never represented purchasers. He has always acted as an agent for owners of real property from whom he has collected commissions. In 1933 or 1934 petitioner moved to a community within the City of Los Angeles known as Valley Village, where he opened a real estate brokerage office. In 1935 he purchased property in that community located at the northwest corner of Laurel Canyon Boulevard and Magnolia Avenue, referred to by the parties as Parcel 1, upon which he constructed a building, in which subsequently he maintained an office and part of which he rented to a restaurant. During the taxable years petitioner maintained that office and another office at 12160 Victory Boulevard, North Hollywood. Most of his brokerage business is confined to an area within a radius of three miles of each office. Petitioner is now considered to be one of the leading real estate brokers in the San Fernando Valley. He has 12 salesmen working out of his office in Valley Village. As part of his brokerage activities he has been concerned with aiding the development of that area. In 1943 or 1944 petitioner *141 began to breed horses. In May 1943 he acquired property of about four acres at 6961 Whitsett Avenue, North Hollywood, called Parcel 3 by the parties, and containing a house, at a cost of $8,500, with a down payment of $1,700. Subsequently he maintained a horse breeding farm on this property. In August 1947, after moving his farm, he sold a portion of this property, including the house, for a sales price of $19,500, paying a commission to Frances White, and reporting a profit of $772.30. In 1948 he sold the remaining portion of the property. In May 1946 petitioner moved his farm to 16301 Foothill Boulevard, San Fernando. A property at this location, called the Sylmar Ranch, referred to by the parties as parcel 21, was purchased by petitioner in several portions during the years 1946 to 1949, inclusive, for use as a ranch. In May 1946 two portions consisting of 44 and 88 acres each, were purchased for $23,500 and $35,000, respectively, with down payments of $9,780 and $12,000, respectively. In August 1946 three acres were purchased for $3,000 cash. In April 1947 80 acres, including an eight-room house, were purchased for $35,000, with a down payment of $5,000. Other purchases were *142 made in succeeding years. Petitioner now operates a 400-acre ranch, of which he owns about 270 acres, and upon which he maintains a herd of more than 125 horses, specializing in American saddle-bred registered horses. During the years in controversy petitioner purchased and sold the following properties: An unimproved parcel of about three acres, referred to by the parties as parcel 4, called the Gentry Avenue property, had been purchased in October 1943 at a cost of $1,975, with a down payment of $415. It was sold in February 1945 for a sales price of $3,000. Petitioner made the sale personally, and he reported a profit on the transaction of $972.46 in his tax return. A property at 6443 Troost Avenue, called Parcel 5 by the parties, located about 2 1/2 miles from petitioner's office in Valley Village, and containing five rental units, had been purchased by petitioner and Dr. Church, each taking a one-half interest, in October 1943 at a total cost of $12,500, with a down payment of $2,500. It was sold in November 1945 at a sales price of $15,950, commissions being paid to O. K. Multiple Listing Service, Inc., and to Mildred Carpenter. Petitioner reported a profit on his tax return *143 of $1,723.42. A property, referred to by the parties as Parcel 6, and consisting of 10 unimproved lots at the corner of Chandler Avenue and Laurel Canyon Boulevard, had been purchased in January 1944 at a cost of $13,500, with a down payment of $1,500. In October 1944 he sold a portion of the property for $18,250 to Dr. Church, reporting a profit of $9,477.66, and in November 1944 he sold another parcel for $3,250, reporting a profit of $2,444.19. In January 1945 he sold a parcel for $2,500 to McKiernan, reporting a profit of $1,711.20, and in the same month he sold another lot for $2,957.94 upon which he reported a profit of $2,140.41. In February 1945 he sold a lot for $3,000, paying a commission to Higgins, and reporting a $2,057.32 profit. In April 1945 he sold a lot for $3,700 upon which he reported a profit of $2,617.74. In June 1945 he sold a lot to Dr. Church for $4,250, reporting a profit of $2,692.05. In July 1945 he sold a lot for $3,750, paying a commission to Higgins, and reporting a profit of $3,114.43. In December 1945 he sold a lot for $3,250, paying a commission to Higgins, and reporting a profit of $2,624.77. A property, known as the Laurel Lots, referred to *144 as parcel 8, and consisting of unimproved lots located one block north of petitioner's office in Valley Village, had been acquired in November 1944 at a cost of $11,000, with a down payment of $2,700. In June 1945 petitioner personally sold one of the lots for $7,000, reporting a profit of $4,923.30. In the same month another of the lots was sold for $8,100, petitioner reporting a $5,594.10 profit. In September 1945 a lot was sold for $3,482.06 at a reported profit of $2,367.36. In February 1946 petitioner sold a lot for $15,000 to his sister, Louise Burns, at a profit of $9,886.16. A property at 12206 Hatteras Avenue, called parcel 9, had been acquired in December 1944 at a cost of $6,750, with a down payment of $2,450. It was purchased as an accommodation to the previous owner, for whom one of petitioner's salesmen was acting as agent, when a proposed buyer defaulted. Petitioner acquired and held it for purpose of resale. It was sold in February 1945 after being listed with the O. K. Multiple Listing Service, Inc., at a sales price of $7,850, with a commission to Higgins, and a reported profit of $713.53. Parcel 10, called the Dunlap property, was acquired in January 1945 at *145 a cost of $2,277, with a down payment of $512. It was sold in June 1946 at a sales price of $4,512.50, a commission being paid to a salesman, and petitioner reporting a profit on his tax return of $2,183.50. Parcel 11, called the Van Owen property, comprising about 10 acres, located at the intersection of Van Owen and Tampa Streets, was purchased in February 1945 by petitioner and his sister, Louise Burns, each acquiring a one-half interest, at a total cost of $5,531.34, with a down payment of $2,500. In April 1946 it was sold for $15,000, a commission being paid to Rydell, and petitioner reporting a profit of $4,279.73. A property called the Gibbs Lots, referred to as parcel 12, and consisting of three unimproved lots, was purchased in April 1945 at a cost of $3,000 with a down payment of $765. One of the lots was sold in July 1945 for $1,850, a commission being paid to Higgins, petitioner reporting a $710.58 profit. Another lot was sold in September 1945 for $1,850, Higgins receiving a commission, and petitioner reporting a $690.74 profit. A third lot was sold in February 1946 for $2,000, Higgins receiving a commission, and petitioner reporting a profit of $804.18. An unimproved *146 lot at 11034 Morella Street, called parcel 13, was purchased in April 1945 for $900. It was purchased and held for resale at a profit. It was sold in April 1945 for $1,350, Higgins receiving a commission, and petitioner reporting a profit on his return of $278.99. A property, referred to as parcel 14, on the southwest corner of Laurel Canyon Boulevard and Weddington Street, was purchased in April 1945 for $2,208.17 with a down payment of $700. It was sold in June 1946 for $11,750, petitioner reporting a profit of $9,432.19. Subsequently, in August 1947, petitioner reacquired this parcel in an even exchange, trading a portion of the 13-acre property, called parcel 16, hereinafter described. A property, called parcel 15, on the northwest corner of Whitsett Avenue and Sherman Way, was purchased in August 1945 for $9,591.92 with a down payment of $3,250. Parcel 15 was listed for sale with the O. K. Multiple Listing Service, Inc., and advertised for sale in a newspaper. It was sold in May 1946. Two purchasers paid $6,750 each, and a third paid $13,500, a commission being paid on each to Higgins; a fourth purchaser paid $7,875. The sales prices totaled $34,875, and petitioner reported *147 a profit on his tax return of $22,932.37. A property, called parcel 16, comprising about 13 acres on the southwest corner of Victory and Laurel Canyon Boulevards, located about 1 1/2 miles from petitioner's brokerage office in Valley Village, was purchased in August 1945 for $28,500 with a down payment of $8,500. In December 1946 he sold two portions of parcel 16, each about one-half acre, for sales prices totaling $14,750, reporting $10,077.15 profit. In 1947 he sold other portions in February, May, July, and December, for sales prices of $10,450, $7,750, $10,000, and $22,750, respectively, reporting profits of $8,231.31, $5,659.17, $6,840.38, and $20,623.60, respectively. In March 1948, at a cost of $38,000, with a down payment of $8,000, he repurchased the portion of this property which he had previously exchanged in an even trade in August 1947, for a portion of parcel 14, hereinabove described. During 1948 and 1949 he sold portions of parcel 16 in eight separate transactions. In December 1948 he repurchased the portion previously sold in July 1947, which he later sold in three additional transactions. A property comprising 10 unimproved acres on the southwest corner of Whitsett *148 Avenue and Sherman Way, referred to as parcel 17, was purchased in February 1946 at a cost of $20,000, with a down payment of $7,000, petitioner and McKiernan each acquiring a one-half interest, and it is still owned by petitioner. A property, called the Laurel Lots, fronting on the east side of Laurel Canyon Boulevard between Magnolia Avenue and Weddington Street, referred to as parcel 18, was purchased in February 1946 at a cost of $26,250. Petitioner acquired it for purpose of resale. In March 1946 he sold one portion of the property for $26,250, reporting $7,363.68 profit. In April 1946 he traded another portion of this property to his sister in an even exchange for a portion of the property hereinabove referred to as parcel 1. A property, referred to as parcel 19, called the Victory property, located on Victory Boulevard one block west of Whitsett Avenue, was acquired in February 1946 for purpose of resale at a profit at a reported cost of $2,006.50, consisting of $500 cash, plus a stallion. In March 1946 it was sold for $2,750, a commission being paid to Higgins, and petitioner reporting a profit of $527.23. A property on the northwest corner of Laurel Canyon Boulevard *149 and Weddington Street, called parcel 19-1, was purchased in March 1946 by petitioner and his sister, Louise Burns, each acquiring a one-half interest, at a total cost of $7,500, full payment being made in cash. It was sold at a profit in February 1950. A property comprising 20 acres on the southeast corner of Burbank and Ethel Streets, called parcel 20, was purchased by petitioner and McKiernan, petitioner acquiring a two-thirds interest in May 1946 at a total cost of $50,000, including the assumption of a mortgage of about $30,000. Petitioner acquired it for purpose of resale at a profit. Subsequently it was split into parcels which were advertised for sale. During the period from July to November 1946 parcels of this property were sold in eight transactions for sales prices totaling $80,425, commissions being paid to salesmen, and petitioner reporting a profit on these transactions totaling $15,236.75. A portion of the property is still retained by petitioner and McKiernan. A property, called parcel 22, consisting of 3.4 acres and a house at 12264 Victory Boulevard was acquired in August 1947 for $23,750, with a down payment of $7,000. Petitioner acquired it for purposes of *150 development and investment and he still owns and rents the property. Many of the above properties which were sold were handled by petitioner in a manner similar to his brokerage treatment of realty owned by others, that is, he put up road signs, inserted newspaper advertisements, sent listings to other brokers, and used other available means of advertising. He was willing to split up the properties to suit the purchasers. Brokers' and salesmen's commissions were taken into account in the calculation of capital gains and losses. Some sales were made by petitioner personally, and others by independent brokers, Rydell, Carpenter, and White. Except in the case of the latter, commissions on sales were made by salesmen associated with petitioner's brokerage office, which paid all office and selling expenses. These salesmen divided their commissions with petitioner, which he reported as part of his gross receipts from his brokerage business. Petitioner maintained one bank account in which he deposited all income from all sources, and upon which he drew to pay expenses arising from all of his activities. Petitioner's books and records consist of a cash record reflecting income and disbursements. *151 This record includes disbursements relating to all of petitioner's activities. In his records and in his tax returns, petitioner did not make any segregation, as between his brokerage business and his activities in acquiring and selling real estate, with regard to disbursements for telephone, advertising, stenographic service, stationery, depreciation, taxes, and other items of selling expense and general expense. All of those disbursements were deducted by petitioner in his tax returns as expenses of his brokerage business. Petitioner's tax return for 1945 reported income of $23,850.19, consisting of: Dividends and interest of $101.23; net profit from rents of $5,448.13; net profit from his business as a realtor of $10,645.76, resulting from total commissions of $36,663.58, with deductions of $26,017.82; gain from sale or exchange of capital assets of $34,932.42, of which $18,663.13 was shown as taxable; and a net farm loss of $11,008.06. His 1946 return reported income of $34,247.91 consisting of: Net profit from rents of $5,759.03; net profit from his business as a realtor of $628.10, resulting from total commissions of $33,261.94, with deductions of $32,633.84; gain from sale *152 or exchange of capital assets of $82,722.94, of which $52,925.32 was shown as taxable; and net farm loss of $25,064.54. His 1947 return reported a loss of $6,898.91 consisting of: Net profit from rents of $7,755.14; net loss from his business as a realtor of $11,762.45 resulting from total commissions of $21,237.03, with deductions of $32,999.48; gain from sale of exchange of capital assets of $42,126.76, of which $21,594.88 was shown as taxable; and net farm loss of $24,486.48. Respondent's notices of deficiency made adjustments in order to include, as ordinary income, the gain from the sale of property "which you held primarily for sale to customers in the ordinary course of your trade or business." The properties in controversy sold during the taxable years were held by petitioner primarily for sale to customers in the ordinary course of his business. Opinion Since under either 117 (a) or 117 (j) capital gain treatment is denied to property "held * * * primarily for sale to customers in the ordinary course" of the taxpayer's business, it becomes necessary here to determine petitioner's dominant motive in handling the real property which gives rise to this controversy. This *153 we have done as indicated by the foregoing ultimate finding. Unlike many of the cases in this general field, petitioner's activities did not consist solely in the disposition of properties already owned. Cf., e.g., ; , certiorari denied, ; . Depending on the interpretation given by the respective parties to the relationship between the detailed transactions, petitioner engaged in from 16 to 20 acquisitions in the three tax years in issue, while making from 24 sales as computed by petitioner to 44 as calculated by respondent. Petitioner may have had various reasons for buying and holding these properties, but the whole history of his activities satisfies us that the "primary" intention was to sell them within a comparatively short time at what frequently turned out to be a handsome profit; and that this was the basic purpose for which they were not only "held" but in fact acquired. Nor do we view the frequency and continuity, as well as the financial result [1] of these *154 operations as falling short of at least a part of petitioner's "trade or business." , certiorari denied, ; . And since under these circumstances "any person who can be found to buy such property is a customer," , the deficiency was correctly determined and must be approved. Decision will be entered for the respondent. Footnotes
1. In each of the three years before us, petitioner's principal source of income was his profit on the sale of real property.↩